**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **Luis D. Ramos,** | ) | **CASE NO. 1:12 CV 132** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| v. | ) | |
| | ) | |
| **R. Gansheimer,** *et al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**Introduction**

This matter is before the Court upon defendant Jason Johnston's Motion for Summary Judgment (Doc. 43). This case involves a prisoner and alleges retaliation for the filing of a grievance. For the following reasons, the motion is GRANTED.

**Facts**

*Pro se* plaintiff Luis Ramos filed this action under 42 U.S.C. § 1983 against Lake Erie Correctional Institution (LECI), Warden R. Gansheimer, LECI Deputy Warden Ms. Joyce, LECI Sergeant Johnston, and LECI Sergeant Hammon. In the Complaint, plaintiff alleges defendants retaliated against him for filing a grievance by unfairly convicting him of a conduct

violation. The Complaint alleges the following. Plaintiff is a bilingual Latino prisoner. LECI has an unwritten policy requiring Latino inmates to speak English in the presence of staff or to reveal the substance of conversations conducted in Spanish to a staff member when asked to do so. On March 20, 2011, plaintiff filed an informal complaint resolution (ICR) against Sergeant Johnston alleging "improper supervision" and "encouragement of discriminatory questions." As a result, Johnston told plaintiff that the grievance process is for bitches, he would be "in a lot of trouble" if he continued to write informal complaints, and plaintiff could receive "great perks" if he agreed to become an informant for the corrections officers. Plaintiff declined the offer to become an informant, but did not further pursue the grievance because he feared reprisals from corrections officers. Sergeant Johnston then conspired with other staff members to falsely accuse plaintiff of receiving a cell phone from Inmate Little. Lieutenant Mauro wrote the conduct report which was upheld on appeal.

This Court previously dismissed all claims except the retaliation allegation against Johnston.

Evidence[1] now submitted to the Court reveals the following facts. On March 16, 2011, Sergeants Jason Johnston and Mark Ashcraft were present at a question and answer session with plaintiff to question him about why he was speaking Spanish to a group of inmates in the back day room, an unauthorized group activity. Plaintiff explained that he was teaching an English class, an unauthorized activity. After the session, plaintiff was placed in segregation pending

---

[1] The Court has also considered the statements made in plaintiff's "verified" brief opposing the motion. Additionally, plaintiff filed a surreply, without leave, which appended further documents. In affording plaintiff all deference, the Court has considered this evidence.

investigation of the unauthorized group activity. (Johnston and Ashcraft affs.) According to Warden Gansheimer, LECI has a policy prohibiting inmates from engaging in unauthorized activity, which included the English class that plaintiff was admittedly conducting in March 2011. (Gansheimer aff.)

On March 20, 2011, plaintiff filed an Informal Complaint Resolution (ICR) to Captain Litwiler which generally states the following. (Doc. 49 Ex. B 1-4). Plaintiff went to Sergeant Johnston's office to request the bunk he had prior to being taken to segregation. Johnston told plaintiff that he was not entitled to his old bunk because he went to segregation under investigation, but that he would get it back for him. At this point, Sergeant Ashcraft interjected with questions which Johnston requested that plaintiff answer: 1) Why did plaintiff speak Spanish with others, 2) Explain what plaintiff was saying to the others in Spanish, and 3) What were the Hispanic inmates planning. Plaintiff responded that he had no history of violence at the institutions. Plaintiff's answers to the sergeants did not satisfy them and Johnston indicated that now he was not sure whether he would give plaintiff his bunk back. (*Id.*) Captain Litwiler's response to the ICR stated, "Again, you are required to speak English when in the presents (sic) of staff. You are required to tell staff what you were speaking about if questioned by staff." (*Id.*)

According to Johnston, prior to May 5, 2011, he had been working with a confidential informant (CI) regarding a cell phone and DVD player. The CI had told Johnston that Inmate Little was in possession of both. After receiving the tip, Johnston spoke with Captain Litwiler, Lieutenant Mauro, and Sergeant Fisher about the next appropriate action, but plaintiff was not mentioned. Mauro approved a search of the bunk area which housed Little. Upon initiation of

-3-

the search, Johnston and Officer Gammon began handcuffing Little and his bunkmate. Mauro and Fisher entered through the back door of the bunking area. Johnston and another officer escorted both inmates out of the bunking area while Gammon and Fisher performed the search. The search resulted in the discovery of a DVD player, three DVDs, and other miscellaneous electric parts. Upon Mauro's recommendation, Little was placed in segregation for possession of contraband. Plaintiff was also placed in segregation, pending further investigation, "as surveillance video footage depicted Little handing off contraband to [him]." Other than completing the conduct report, Johnston played no role in the investigation, the Rules Infraction Board's (RIB) decision making, or the appeals to Warden Gansheimer and the ODRC Director. (Johnston aff.)

Johnston's Incident Report, completed on March 5, 2011, also provides the following information. Johnston had been working with the CI for four to six weeks. The CI had given information that Inmate Little had a cell phone and DVD player. Johnston spoke with an inspector, Captain Litwiler, Lieutenant Mauro, and Sergeant Fisher and formed a plan. Ultimately, the search revealed a DVD player, three DVDs, and other miscellaneous electric parts. Other staff members then

> reported a muffled ringing sound. Upon searching and reviewing the video cameras it was noticed that while officer Gammon was placing inmate Little in handcuffs he handed something off to inmate Ramos. Upon further review inmate Ramos was seen throwing part of the cell phone into the trash while being escorted. The remains of the phone were located in a paper towel in the c side bathroom. Inmates Little and Ramos were placed in segregation.

(Doc. 45 Ex. E).

According to Lieutenant Kenneth Mauro, Johnston contacted him on May 5, 2011

-4-

regarding the CI tip on Little, but Ramos was not mentioned during the conversation. Mauro authorized the search of Little's bunk, which included several officers due to Little's history of violence and insubordination. Officers found contraband in Little's possession. Mauro and other officers watched video footage of the search "which showed Little passing something to Ramos" who then went to the bathroom and upon leaving the bathroom, throw something away into the trash can outside of the bathroom. There is no surveillance inside the bathroom. Staff members "found part of a cell phone" in the trash can, and "discovered the rest of the phone" in "the bathroom itself." Based upon his personal observations, the surveillance footage, the discovery of the cell phone in the bathroom, and the evidence gathered in the investigation, Mauro and other officers concluded that Ramos was in possession of contraband and had discarded it in the trash can. Upon his recommendation, Little and Ramos were put in segregation for possession of contraband. (Mauro aff.)

Sergeant Jeff Fisher was also involved in escorting Little out of the bunking area with other officers after being approached by Johnston and Mauro regarding the CI's tip. He does not recall watching the surveillance video of the search, but was instructed by Mauro to search the bathroom where he "spotted a wadded up roll of toilet paper in a stall [and] upon closer examination, ... discovered part of a cell phone inside the toilet paper." (Fisher aff.)

Fisher prepared an Incident Report that day and stated that when conducting a search of the bathroom, he "spotted a w[a]dded up roll of toilet paper in a stall. After a closer look I found parts of a cell phone inside the toilet paper." (Doc. 45 Ex. F)

Officer John Bennett, who did not participate in the search, viewed the surveillance footage which showed Ramos throwing something into the trash can by the bathroom. (Bennett

-5-

aff.)

Plaintiff apparently challenged Mauro's decision. A hearing was held before the RIB on May 16, 2011. (Doc. 49 Ex. F) Plaintiff testified and offered a defense. Lieutenant Mauro was the "charging official." On May 31, 2011, the RIB found plaintiff in violation of the rules charged. The RIB stated the following facts:

> Charging official stated charging official and 4 other staff members watched video evidence of Inmate Little passing something to accused. Accused was viewed going to the bathroom and when exiting throwing something in the trash can. Trash can was searched and pieces of cell phone was found in trash can and in bathroom. Accused pled not guilty and stated Little never came to accused rack. Accused stated the video will show that accused stayed in bunk area. Accused stated accused wants this case sent to outside court so the video can be examined. Accused stated the inmate that had the item never came back to accused area. Accused waived charging official. Case continued so video evidence can be reviewed. Case continued to 5/31/11. Video evidence was unable to be retrieved. Case continued length due to unavailability of charging official and RIB panel member. RIB panel contact charging official Lt. Mauro. ... (indecipherable)

The RIB stated that it relied on the following evidence in making its decision: conduct report, incident report, photos, inmate testimony, charging official testimony. (*Id.*)

According to Warden Gansheimer, plaintiff appealed the RIB ruling to him. Gansheimer denied the appeal based on his review of the conduct reports, incident reports, the fact that the officers found contraband and attributed it to Little and Ramos, and the surveillance video. Plaintiff appealed to the ODRC Director who also upheld the discipline. Throughout the appeal process, plaintiff did not indicate that Johnston acted in retaliation. (Gansheimer aff.)

Plaintiff's brief states that in March 2011, he was merely involved in "informal discussions" about the English language, which is an authorized joint activity under the ODRC policy addressing unauthorized group activities. Plaintiff requested to have his bunk location

-6-

restored since he was not found to have violated any prison rules.  This triggered the question and answer session with LECI staff on March 16, 2011. As a result of that session, plaintiff filed his informal complaint on March 20.  After Johnston threatened plaintiff that he would get into a lot of trouble by continuing the grievance process, plaintiff immediately halted it. Johnston thereafter, in retaliation, contrived the scheme in collusion with others to make it appear that plaintiff had been involved in a major rules infraction, i.e., possession of the cell phone. When plaintiff exposed the plot by proving that he was not the subject whose image appeared on the video, a secondary collusion occurred in the spoliation of the video.  (Doc. 45 at 2-3)

This matter is now before the Court upon defendant Jason Johnston's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Exhaustion**

-8-

Defendant argues that plaintiff failed to exhaust his retaliation claim given that he appealed his discipline for the contraband conviction but never mentioned the threat of retaliation by Johnston.  Plaintiff states that because of his fear of Johnston, who had a reputation for mistreating inmates, he did not continue his grievance process beyond the first step.

Under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), prisoners must exhaust their administrative remedies before challenging prison conditions under § 1983 or any other Federal law. *See also Solomon v. Michigan Dept. of Corrections,* 2012 WL 1522932 (6th Cir. May 1, 2012) (citations omitted) (Exhaustion is mandatory and a prisoner is required to properly exhaust his administrative remedies prior to filing a § 1983 claim in federal court.) The exhaustion requirement applies to the filing of § 1983 claims and any other actions based on a Federal law.  *Napier v. Laurel County, Ky.,* 636 F.3d 218 (6th Cir. 2011) "The exhaustion requirement 'applies to all prisoners seeking redress for prison circumstances or occurrences,' whether for broad prison conditions suits or for individual allegations of abuse." *Reynolds-Bey v. Harris,* 428 Fed.Appx. 493 (6th Cir. 2011) (citing *Porter v. Nussle*, 534 U.S. 516, 520 (2002)).

Furthermore, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* (citing *Jones v. Bock*, 549 U.S. 199 (2007)); *Peterson v. Cooper,* 2012 WL 573954 (6th Cir. Feb. 23, 2012).  Proper exhaustion is required which "means using all steps that the agency holds out, and doing so properly." *Woodford v. Ngo*, 548 U.S. 81 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules...." *Id.* "The benefits of exhaustion can be realized only if the prison grievance

system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Id.* at 95; *Richmond v. Settles,* 450 Fed.Appx. 448 (6th Cir. 2011)**.**  "Unexhausted claims should be dismissed without prejudice."  *Sarah v. Deshambo*, 67 Fed.Appx. 346 (6th Cir. 2003)(citing *Hartsfield v. Vidor,* 199 F.3d 305 (6th Cir. 1999).

Warden Gansheimer avers that when an inmate is disciplined, he can appeal the Rules Infraction Board ruling to the Warden.  If the Warden upholds the decision to discipline, the inmate can appeal to the ODRC Director at the state level.  Ramos took each of these appeals regarding his discipline arising out of the cell phone incident, but he never mentioned any retribution or retaliation on the part of Johnston.  (Gansheimer aff.)

Plaintiff concedes that he never filed a grievance against Johnston claiming retaliation. He argues that his failure to exhaust should be excused because of his fear that Johnston would harm him if he continued the grievance process.  Plaintiff's assertions are not factually persuasive, and not supported by law.

As discussed above, plaintiff appealed his discipline regarding the cell phone incident to the RIB, appealed the RIB's decision to the Warden, and appealed the Warden's decision to the ODRC.  Plaintiff repeatedly states in his brief that it was Johnston's investigation and his vindictive agenda which resulted in plaintiff's conviction of a major rule violation.  It is undisputed that plaintiff did not allege Johnston's retaliation within those appeals, while he was not afraid to challenge Johnston's role in his conviction.   Finally, plaintiff submits an Informal Complaint Resolution that he filed on May 9, 2011, stating that Lieutenant Mauro ordered him to segregation  based on the cell phone incident and that plaintiff wanted the video preserved.

(Doc. 50 Ex. B) But, plaintiff did not mention Johnston in that grievance.

Moreover, plaintiff seems to be confusing his failure to continue the grievance process initiated with the filing of his original ICR in March 2011 with that of the appeals he took regarding the cell phone incident. Plaintiff repeatedly states that he was afraid to continue that original grievance out of fear of Johnston. Retaliation was not at issue until after the May 2011 contraband incident. Plaintiff did exhaust his remedies as to that incident, but did not mention retaliation.[2]

Furthermore, courts have not recognized a fear of retaliation as an exception to the PLRA's exhaustion requirement. *Hines v. Valhalla County Correctional,* 2002 WL 1822740 (S.D.N.Y. Aug. 8, 2002) ("A general fear of retaliation is not an exception to the PLRA's exhaustion requirement.") *See also Sarah v. Deshambo*, 67 Fed.Appx. 346 (6th Cir. 2003) (Where plaintiff alleged that he did not exhaust his available administrative grievance remedies because he feared retaliation, the district court properly dismissed the complaint without prejudice.)

For these reasons, dismissal is proper for failure to exhaust.

**(2) Merits of the retaliation claim**

Even assuming plaintiff did exhaust, his retaliation claim fails.[3] To state a prima facie

---

[2] Defendant also points out that prior to filing suit, plaintiff was transferred to Warren Correctional Institution where he would no longer fear Johnston's retribution. But it appears that plaintiff's administrative appeals were completed by the time of his transfer and, therefore, this argument is not persuasive. (See pltf. depo. at 72 and Doc. 49 Ex. H)

[3] For this reason, the Court need not dismiss the retaliation claim without prejudice because (continued...)

-11-

case for retaliation prohibited by the First Amendment, plaintiff must establish that: 1) he engaged in protected conduct; 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) a causal connection exists between the first two elements. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Defendant argues that the first and third elements are not met.

### (a) protected conduct

Filing a grievance against prison officials is conduct protected by the First Amendment, unless the grievance is frivolous. *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir.2000). "This court has held that the filing of non-frivolous grievances is protected conduct under the First Amendment." *Scott v. Stone*, 254 Fed.Appx. 469 (6th Cir. 2007) (citation omitted). Conversely, frivolous grievances are not protected conduct.

"If a prisoner violates a legitimate prison regulation, he is not engaged in protected conduct" and cannot proceed beyond step one of the three step retaliation analysis. *Smith v. Craven,* 61 Fed.Appx. 159 (6th Cir. 2003) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999)).

*See also Lockett v. Suardini*, 526 F.3d 866 (6th Cir. 2008) (citing *Turner v. Safley*, 482 U.S. 78, 89, (1987) (holding that a prison regulation that "impinges on inmates' constitutional rights" is nevertheless valid if that regulation "is reasonably related to legitimate penological interests").

In *Lockett,* the prisoner admitted to calling the hearing officer a "foul and corrupted bitch"

---

[3](...continued)
 it fails on the merits and refiling would be futile.

which clearly fell within the prison policy directive defining prohibited insolent behavior. Here, defendant asserts that plaintiff was admittedly engaged in an unauthorized and unsupervised English class which violated LECI policy prohibiting inmates from engaging in unauthorized conduct. Therefore, his ICR against Johnston was a frivolous allegation and not protected conduct.

Plaintiff asserts in his brief that he was "merely involved in informal discussions about the subject of the English language" which prison policy allows. The policy plaintiff relies on regarding unauthorized group activity states that it does not prevent "authorized joint activities such as sporting or recreational activities... or informal discussions on various topics." (Doc. 45 Ex. C)

Plaintiff's assertion, even assuming his brief is a verified statement, is insufficient to show his grievance was not frivolous. Sergeant Ashcraft's affidavit states that when questioned as to why plaintiff was speaking Spanish to a group of six or seven inmates, plaintiff explained that he was teaching an English class which was against LECI policy because it was an unauthorized group activity. In his Complaint, plaintiff did not allege that he was merely involved in informal discussions about the English language but took issue with LECI's unwritten policy of requiring Latino prisoners to speak English in the presence of prison staff, and complained that no other race was required to tell staff the contents of their conversations if observed to be speaking in another language. Notwithstanding, plaintiff does not controvert Ashcraft's averment because plaintiff does not now assert that he told Johnston and Ashcraft during the question and answer session that he was involved in informal discussions as opposed to teaching an English class. Rather, he merely states in his brief that he was involved in the informal discussions.

Additionally, in his surreply brief, plaintiff points out that the March 2011 ICR has nothing

to do with English classes. However, plaintiff authored the ICR, and identified the questions that Johnston and Ashcraft asked of him.  Merely because plaintiff does not state in his own ICR that he told the sergeants he was teaching an English class, the Court cannot find an issue of fact as to whether plaintiff's grievance was frivolous.   In fact, the ICR does not state that plaintiff was "merely involved in informal discussions about the subject of the English language" either.

The Court finds Ashcraft's averment that plaintiff told him that he was teaching an English class to be undisputed.  The Warden explained in his affidavit that conducting the English class was an unauthorized activity and, therefore, Sergeants Johnston and Ashcraft acted appropriately in reprimanding plaintiff. As such, the ICR plaintiff filed against Johnston arising out of the questioning of plaintiff was frivolous and plaintiff did not engage in protected conduct.

**(b) causal connection**

Even assuming plaintiff has demonstrated that filing the original ICR was protected activity, the Court agrees with defendant that plaintiff fails to satisfy the third element of his claim, i.e., Johnston's action was motivated, at least in part, by that protected conduct. *See Patterson v. Godward,* 2012 WL 5477102 (6th Cir. Nov. 9, 2012) (citing *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir.2010) ("If the prisoner can show that the defendants' adverse action was at least partially motivated by the prisoner's protected conduct, then the burden shifts to the defendants to show that they would have taken the same action even absent such protected conduct.")

Plaintiff contends the following. Johnston contrived a scheme in collusion with others to make it appear as though plaintiff had been involved in a major rule violation. Evidence that the event was falsified is partly supported by the conflicting facts contained in the Incident Reports completed by Johnston and Fisher. (Doc. 45 Exs. E and F) Johnston stated that the cell phone was

-14-

found in a paper towel while Fisher stated that it was found inside a wadded up roll of toilet paper. Mostly, however, evidence of collusion is found in the fact that the video, which all the staff relied on to convict plaintiff, is missing:

> Again, each of the reporting staff claims that what they witnessed was on an alleged video. Ergo, the video would be the only evidence, and the only evidence has disappeared which has collusion written all over it. Just as 'where there's smoke, there's fire,' where there's collusion in a case such as this one, retaliation is certainly in the neighborhood.

(Doc. 45 at 4) Plaintiff surmises that Johnston's Incident Report shows that no matter who was involved, it was Johnston's investigation which provided the opportunity for retaliation.

For the following reasons, the Court finds that plaintiff has failed to satisfy this element. The affidavits show that although Johnston initiated the investigation into Little, the alleged retaliatory acts regarding plaintiff's segregation for contraband were beyond Johnston's control. After being contacted by Johnston regarding the tip that Little possessed contraband, Lieutenant Mauro authorized the search of Little's bunk, several officers participated in the search and reviewed the video surveillance, Mauro made the decision to place both plaintiff and Little in segregation, and Fisher found the cell phone in the bathroom and filed an Incident Report. Johnston avers that other than completing the conduct report, he played no role in the investigation, the RIB decision making, or the appeals to the Warden and ODCR director. The RIB decision shows that Mauro was the charging official before the RIB, and Sergeant Hammond issued the RIB decision. The Warden avers that he personally reviewed the conduct reports, incident reports, other information, and the video in determining that there was sufficient evidence to conclude that plaintiff possessed contraband. Even plaintiff's Complaint alleges that Mauro wrote the false conduct report, and Sergeant Hammon issued the RIB decision. (Compl. ¶¶ 10, 13-14)

Moreover, the missing video does not provide evidence of Johnston's retaliation. Plaintiff asserts in his brief, "How could the most critical part of evidence which all claim they relied on go missing?  Because they <u>know</u> plaintiff's image was not on it."  (Doc. 45 at 4) But, Johnston is the only defendant in this case, and plaintiff must show that he acted in retaliation.  Thus, plaintiff's claim of unidentified "cohorts" is irrelevant.  In a similar manner, plaintiff asserts in a separate motion seeking sanctions for spoliation of the video that "everyone whom plaintiff asked to preserve the video" should be sanctioned. But, at a minimum, plaintiff failed to show, or even address in that motion, that Johnston played any role in the alleged spoliation. To the contrary, Johnston presents his affidavit which states that he was never in possession of the video and, as a sergeant, was not authorized to retain custody of or personally possess recordings from surveillance cameras.  Johnston also attests that he never discarded or destroyed the video, or directed anyone to do so. (Doc. 48 Ex. A)

Additionally, even assuming the video does not show plaintiff's image, there is no basis to find that Johnston somehow convinced the officers who attested that they viewed the video to report that it was plaintiff on the video.  Nor is there any basis to find that Johnston somehow created the video in retaliation for plaintiff filing the earlier grievance to make it appear as though plaintiff's image was on it.  Plaintiff is correct that all the officers relied on the video, except for Fisher who found the cell phone.  But, this is not an appeal of plaintiff's conviction for possession of contraband, in which case the issue of the missing video may be relevant.  Rather, this is a case of Johnston's alleged retaliation. As already discussed, there is no issue of fact supporting such. [4]

---

[4] Plaintiff's Motion for Sanctions for Spoliation is denied by separate marginal order as the
(continued...)

Likewise, the purported inconsistency between Fisher's and Johnston's characterization of where the cell phone was found provides no basis to show collusion or retaliation. Fisher found the cell phone in a "wadded up roll of toilet paper." Johnston, who did not find it, states that it was found in a "paper towel." This issue of fact is not material, and no reasonable juror would view the discrepancy as evidence of retaliatory behavior.

**Conclusion**

For these reasons, defendant Jason Johnston's Motion for Summary Judgment is granted. Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/26/13

---

[4](...continued)
video is not relevant to the Court's analysis of plaintiff's retaliation claim.